UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

Lexington Insurance Company,

                      Plaintiff,

v.

AXIS Surplus Insurance Company,

                      Defendant.

Civ. No. 13-3348 (RHK/FLN)
**MEMORANDUM OPINION AND ORDER**

Mark E. Cohen, Anthony R. Zelle, Zelle McDonough & Cohen LLP, Boston, Massachusetts, for Plaintiff.

Kimberly H. Petrina, Jeremy S. Macklin, Michael S. Knippen, Traub Lieberman Straus & Shrewsberry LLP, Chicago, Illinois, Daniel A. Haws, Murnane Brandt, PA, St. Paul, Minnesota, for Defendant.

## INTRODUCTION

In this action, Plaintiff Lexington Insurance Company ("Lexington") seeks contribution from Defendant AXIS Surplus Insurance Company ("AXIS") for amounts Lexington paid on behalf of their mutual insured, Fagen Inc. ("Fagen"), to settle an underlying lawsuit against Fagen. AXIS now moves to dismiss Count II of Lexington's Complaint, seeking equitable contribution; for the reasons set forth below, its Motion will be denied.

## BACKGROUND

**Fagen's Insurance Policies**

Fagen is a full-service industrial contractor. It is insured under four policies relevant to the instant action.

First, Fagen has a general liability policy from Zurich American Insurance Company ("Zurich/Fagen Policy") with a $1,000,000 per-occurrence liability limit. (Compl. ¶ 7.)

Second, it is an "additional insured" under its subcontractor Kiewit's general liability policy from Zurich ("Zurich/Kiewit Policy"), which is a fronting policy[1] with a $5,000,000 per-occurrence liability limit. (Id. ¶ 9.)

Third, it has a professional liability policy from Lexington ("Lexington Policy") with a $10,000,000 per-claim liability limit. (Id. ¶ 15.) This policy covers only Fagen's negligence in the provision of architectural, engineering, and other professional services. It does not cover Fagen's negligent "workmanship, assembly, construction, erection, fabrication, installation or remediation." (Id. ¶ 16.) The policy also provides that it "shall apply as excess insurance over any other valid insurance, whether collectible or not, be it primary, excess or contributing." (Id. ¶ 17.)

Fourth, Fagen has an excess general liability policy from AXIS ("AXIS Policy"), with a $10,000,000 per-occurrence liability limit. (Id. ¶ 8.) This policy does not cover property damage that arises out of the rendering or failure to render professional services, including architectural and engineering services, by Fagen or on Fagen's behalf. (Id. ¶ 13.) The policy provides AXIS will pay "those sums in excess of the 'retained limit' which the insured becomes legally obligated to pay as damages to which this insurance

---

[1] A "fronting" policy is a policy that has a deductible equal to the coverage available under the policy or requires the policyholder (in this case, Kiewit) to reimburse the insurer issuing the policy (Zurich) for any amounts paid under the policy. See Cargill, Inc. v. Ace Am. Ins. Co., 784 N.W.2d 341, 345 (Minn. 2010).

applies because of 'bodily injury', 'property damage', or 'personal and advertising injury'."  (Id. ¶ 10.)  The "retained limit" is the limit of any insurance policy listed in the "Schedule of Underlying Insurance."  (Id.)  This Schedule includes the Zurich/Fagen Policy, but not the Lexington Policy.  (Id. ¶¶ 11–12.)  The policy also has an "other insurance" clause, providing:  "This insurance is excess over, and shall not contribute with, any other insurance, whether primary, excess, contingent or on any other basis.  This condition will not apply to insurance specifically written as excess over this policy."  (Id. ¶ 14.)

**The Underlying Action**

In 2009, Illinois River Energy, LLC ("IRE") filed suit against Fagen, alleging Fagen had negligently designed and built IRE's ethanol plant.  Specifically, IRE alleged that Fagen's design for IRE's concrete corn-storage silos used too little rebar and that in construction, Fagen used even less rebar than the design called for.  IRE alleged these design and construction flaws caused the walls of the silos to crack, among other structural problems, forcing IRE to shut down the plant for for several weeks and suffer multi-million dollar damage.  (Id. ¶¶ 24–25.)  Fagen tendered the action to Lexington, Zurich, and AXIS.  (Id. ¶ 26.)  Lexington and Zurich agreed to defend Fagen.  (Id. ¶¶ 27–28.)  Zurich agreed to defend Fagen under both the Zurich/Fagen Policy and the Zurich/Kiewit Policy.  Lexington agreed to defend Fagen under a reservation of rights including its right to decline indemnification for claims arising out of Fagen's faulty construction.  AXIS did not defend Fagen and issued a reservation of rights letter

asserting various defenses and denying coverage for claims for negligent professional services. (Id. ¶ 29.)

After nearly four years of litigation, the parties in the underlying action, including Fagen, reached a confidential settlement. Lexington requested that AXIS participate in the settlement negotiations and contribute toward the settlement, but AXIS refused. (Id. ¶ 34.) Lexington and Zurich agreed to share the first $2 million in indemnification costs equally—Zurich paying its $1 million limit under the Zurich/Fagen Policy and Lexington paying $1 million under its Policy. (Id. ¶ 37.) Ultimately, Zurich paid the limit of the Zurich/Fagen Policy, Kiewit paid the limit of the Zurich/Kiewit Policy, and Lexington paid substantially more than $1 million to settle the lawsuit, while reserving its right to seek contribution. (Id. ¶¶ 30–33.) The settlement did not allocate damages, rather Lexington alleges the design and construction flaws resulted in a single, indivisible injury (the defective silos). Lexington alleges that Zurich paying the limit of its policy triggered coverage under the AXIS Policy, and that AXIS is required to share the excess indemnification costs that Lexington paid.

After AXIS refused to contribute to the settlement, Lexington filed the instant action alleging two counts: a request for declaratory judgment (Count I) that AXIS is obligated to indemnify Lexington for half of the amount paid by Lexington in excess of $1 million; and a request for equitable contribution (Count II) seeking such payment and attorneys' fees. AXIS now moves to dismiss Count II for failure to state a claim.

## STANDARD OF DECISION

The Supreme Court set forth the standard for evaluating a motion to dismiss in Bell Atlantic Corp. v. Twombly, 550 U.S. 544 (2007), and Ashcroft v. Iqbal, 556 U.S. 662 (2009).  To avoid dismissal, a complaint must include "enough facts to state a claim to relief that is plausible on its face." Twombly, 550 U.S. at 547.  A "formulaic recitation of the elements of a cause of action" will not suffice. Id. at 555.  "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." Iqbal, 556 U.S. at 678 (quoting Twombly, 550 U.S. at 556).

When reviewing a motion to dismiss, the Court "must accept [the] plaintiff's specific factual allegations as true but [need] not . . . accept a plaintiff's legal conclusions." Brown v. Medtronic, Inc., 628 F.3d 451, 459 (8th Cir. 2010) (citing Twombly, 550 U.S. at 556).  The complaint must be construed liberally, and any allegations or reasonable inferences arising therefrom must be interpreted in the light most favorable to the plaintiff. Twombly, 550 U.S. at 554–56.  A complaint should not be dismissed simply because the Court is doubtful that the plaintiff will be able to prove all of the necessary factual allegations. Id. at 556.  Accordingly, a well-pleaded complaint will survive a motion to dismiss even if it appears that recovery is very remote and unlikely. Id.  "Finally, the complaint should be read as a whole, not parsed piece by piece to determine whether each allegation, in isolation, is plausible." Braden v. Wal-Mart Stores, Inc., 588 F.3d 585, 594 (8th Cir. 2009).

## ANALYSIS

**I.     Equitable Contribution**

In Count II, Lexington asserts a claim for equitable contribution against AXIS. Under Minnesota law, equitable contribution is the right of one insurer to recover from a co-insurer amounts it paid in excess of its proportionate share of the two insurers' common obligation.[2]  Cargill, Inc. v. Ace Am. Ins. Co., 784 N.W.2d 341, 352 n.11 (Minn. 2010).  Thus, a claim for equitable contribution requires (1) the insurers share a "common liability" and (2) one insurer paid more than its proportionate share of that liability.  Id.; see also Am. Auto. Ins. Co. v. Molling, 57 N.W.2d 847, 851–52 (Minn. 1953) ("The thing that gives rise to the liability (for contribution) is that both parties were subject originally to a [c]ommon liability, and one has taken more than his just share of the burden.") (internal quotations omitted).  The equitable obligation to contribute is essentially based upon a theory of unjust enrichment—it is meant to "equalize[e] the common burden shared by coinsurers, and to prevent one insurer from profiting at the expense of another." Cont'l Cas. Co. v. Nat'l Union Fire Ins. Co., 940 F. Supp. 2d 898, 929 (D. Minn. 2013) (Tunheim, J.) (internal quotation omitted).

AXIS challenges whether equitable contribution applies in the context of an insurer's duty to indemnify, rather than defend, the insured.  It also challenges whether it has any "common liability" with Lexington, given the differences in coverage between the AXIS and Lexington Policies.

---

[2] The Court applies Minnesota law because both parties cite it in their memoranda.  See BBSerCo, Inc. v. Metrix Co., 324 F.3d 955, 960 n.3 (8th Cir. 2003) (forum law applies in a diversity case when no party has raised a conflict-of-law issue).

### A. Contribution for Indemnity versus Defense

AXIS argues that the right to equitable contribution in Minnesota exists in only "a limited sense." (4/30/14 Hr'g Tr. at 3.) It contends that "this right of action exists in the context of contribution of defense costs, not in the context of indemnity." (Id.) In support, it cites Cargill, which overturned an earlier rule barring contribution for defense costs and held "a primary insurer that has a duty to defend . . . has an equitable right to seek contribution for defense costs from any other insurer who also has a duty to defend the insured." 784 N.W.2d at 354. But Cargill did not *preclude* contribution in the context of indemnity; it simply did not *address* it. In fact, the Minnesota Supreme Court's reasoning in Cargill *supports* Lexington's alleged right to contribution.

Before Cargill, coinsurers in Minnesota had no right to contribution for defense costs. This rule was cemented in Iowa National Mutual Insurance Co. v. Universal Underwriters Insurance Co., 150 N.W.2d 233, 237 (Minn. 1967), which explained that coinsurers had no *common* obligation to defend the insured because "[b]oth were obligated to defend under separate contractual undertakings." The Minnesota Supreme Court was careful to distinguish the duty to defend from the duty to indemnify, stating the question presented in the case was "narrow" and noting the "duty to defend is personal to each insurer" and it is "several," meaning an insurer "is not entitled to divide it." Id.

After carving out several exceptions to the Iowa National rule over the next forty years, the Supreme Court finally overturned it entirely in Cargill. It reasoned that the prior rule encouraged insurers to adopt a "wait and see attitude" and to "play the odds" that it would not ultimately be selected by the insured to defend the suit. 784 N.W.2d at

351–52.  Contribution, on the other hand, "encouraged insurers to fulfill their respective duties" and to resolve their shared burdens promptly.  784 N.W.2d at 351–52.  The Court concluded that the right to contribution was "supported by public policy and [was] the better-reasoned rule."  784 N.W.2d at 353.  It thus established a new rule in Minnesota: "where more than one primary insurer covers the same risk and an insurer discharges a common obligation also belonging to another insurer, . . . a right to equitable contribution should exist."  784 N.W.2d at 353.[3]

In the Court's view, this same reasoning applies in the context of indemnity.  Barring contribution for indemnity would reward insurers who abstain from participating in settlement and require those that do participate to do so at their own risk.  The overall effect would be to deter settlement in suits where the insurers' relative duties are unresolved, leaving both the insurers and the insured at risk of an adverse verdict which, in this case, Lexington alleges could have been catastrophic.  Given these perverse incentives, contribution in the context of indemnity is likewise "supported by public policy and is the better-reasoned rule."  Accordingly, this Court sees no reason why Cargill should be interpreted to preclude Lexington's claim for contribution.

---

[3] The Minnesota Supreme Court's recognition of the right of contribution among coinsurers in Cargill was not unprecedented, as it had previously recognized "a right to contribution based on a common liability in analogous situations," just not for defense costs.  784 N.W.2d at 353 (citing Peterson v. Little-Giant Glencoe Portable Elevator Div. of Dynamics Corp. of Am., 366 N.W.2d 111, 116–17 (Minn. 1985) (recognizing right of contribution between manufacturer and employer where they shared a common liability to the employee, although based on separate obligations)); see also Molling, 57 N.W.2d at 850 (explaining the origins of contribution as an equitable action between co-sureties, not joint tortfeasors); Gugisberg v. Eckert, 111 N.W. 945, 946 (Minn. 1907) (recognizing contribution among co-sureties).

If AXIS and Lexington shared a duty to indemnify Fagen for the settlement and Lexington discharged that common obligation by paying more than its proportionate share of the settlement, then Lexington has a right to equitable contribution. See, e.g., Interstate Fire & Cas. Co. v. Auto-Owners Ins. Co., 433 N.W.2d 82, 83 (Minn. 1988) (determining contribution rights between settling umbrella insurer and noncontributing primary insurer); N. Star Mut. Ins. Co. v. Midwest Family Mut. Ins. Co., 634 N.W.2d 216, 224 (Minn. Ct. App. 2001) (awarding contribution where two insurers' policies covered tortfeasor's liability and only one insurer participated in settlement); see also Home Ins. Co. of N.Y. v. Minneapolis, St. P. & S. S. M. Ry. Co., 74 N.W. 140, 141–42 (Minn. 1898) (recognizing obligation of co-insurers to contribute ratably to mutual insured's damage).

### B. Common Liability

AXIS next argues the parties do not share a "common liability" because (1) AXIS is an excess insurer while Lexington is a primary insurer and (2) AXIS covers damage resulting from the silos' construction while Lexington covers damage resulting from their design. AXIS relies on Continental for the proposition that "common liability" requires the insurers to "share the same *level* of obligation on the same *risk* to the same insured." 940 F. Supp. 2d at 936 n.45 (emphases added) (citing California law). But the ultimate result in Continental *belies* AXIS's argument that it does share a common liability with Lexington because one is an excess insurer and one is a primary. Continental held that seven insurers shared a common liability—the duty to defend their mutual insured—even though six were primary insurers and one was an umbrella insurer. 940 F. Supp. 2d at

934.  In other words, even in <u>Continental</u>, the "level" of insurance was not determinative of the insurers' common liability.  The important consideration in <u>Continental</u>, as in <u>Cargill</u>, is not whether a policy is primary or excess but whether it has been triggered and the insurer thus owes a duty to the insured.

Similarly, the Court is not convinced that insurers must cover the same risk to share a common liability.  In the Court's view, a common liability is defined not by shared coverage of a *risk*, but shared coverage of a *loss*.  Granted, the two usually go hand-in-hand—if multiple insurers cover the same loss it is more often than not because they covered the same risk.  But, as this case demonstrates, that is not always the case.  For example, Lexington acknowledges that it and AXIS cover different risks (faulty design versus faulty construction), but it nonetheless alleges they both cover IRE's damages because Fagen's flawed design *and* construction combined to cause a single, indivisible damage—the cracked corn silos.

Thus, the Court concludes that insurers may share a common liability regardless of whether they insure the same risk at the same level.  See <u>Lametti v. Peter Lametti Constr. Co.</u>, 232 N.W.2d 435, 438 (Minn. 1975) ("As we have often indicated, it is not essential to an action for contribution that the one from whom contribution is sought be in precisely the same position regarding liability to the injured party as the one seeking contribution.  It is enough that the parties share a common liability to the injured party."); <u>Home Ins. Co. v. Certain Underwriters at Lloyd's, London</u>, 729 F.2d 1132 (7th Cir. 1984) (permitting equitable contribution between professional liability and general liability insurers when construction and design defects both contributed to an explosion).

Instead, to determine whether Lexington has alleged a common liability, the Court focuses on whether both parties had a duty to indemnify Fagen for the settlement. Lexington alleged the settlement encompassed damages resulting from Fagen's negligent construction, which the AXIS Policy covers, and that Fagen's primary general liability policy (the Zurich/Fagen Policy) was exhausted, triggering AXIS's duty to indemnify. Accordingly, Lexington has alleged sufficient facts to support a finding of common liability—namely the parties' shared duty to indemnify Fagen for the settlement.

### C. Disproportionate Share

AXIS also argues Lexington cannot show it paid a disproportionate share of the settlement. AXIS challenges the factual basis for Lexington's claim that its "fair share" of the settlement was, essentially, half (half of the first $2 million, shared with Zurich, and then half the excess, shared with AXIS). Because the case was not tried to a jury, damages were not allocated and expert discovery was not completed; without this, AXIS contends Lexington cannot prove what portion of the damages is attributable to Fagen's *professional* negligence. See <u>Bor-Son Bldg. Corp. v. Employers Commercial Union Ins. Co. of Am.</u>, 323 N.W.2d 58, 64 (insured could not prove claim for reimbursement for lost rents where it was not pleaded, there was no evidence establishing the loss, and it was not allocated in settlement). But, as even AXIS acknowledges, the determination of damages is "premature at this motion to dismiss stage." (Def.'s Reply at 11); <u>see</u> <u>Twombly</u>, 550 U.S. at 556 (a complaint should not be dismissed because "actual proof of [the alleged] facts is improbable"). Lexington has alleged it paid more than its proportionate share;

whether it will be able to prove this allegation without an allocation of damages in the settlement agreement is an issue for summary judgment or trial.

## CONCLUSION

Based on the foregoing, and all the files, records, and proceedings herein, **IT IS ORDERED** that AXIS's Motion to Dismiss (Doc. No. 15) is **DENIED**.

Dated: June 4, 2014

s/Richard H. Kyle<br>RICHARD H. KYLE<br>United States District Judge